

TIMOTHY M. BURGESS
United States Attorney

RETTA-RAE RANDALL
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, Room 253, #9
Anchorage, Alaska 99513-7567
(907) 271-5071

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. A03-0159 CR (JKS) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNITED STATES' |
| SHANNON K. BROWN, | ) | POST-SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |
| | ) | |

The United States hereby files its post-sentencing memorandum in support of

the sentence originally imposed by the Court on June 3, 2004.   Shannon K. Brown

("Brown") was sentenced to five  years of probation, with Special Conditions of

Probation to include (1) notification to her current and future employers of the

conviction in the case, unless the supervising probation officer determines that Brown

does not pose a risk, and (2) participation in the home confinement program for a

56

period of six months within the first year of probation, to include electronic monitoring. Docket 35. After the appeal of this case, the Ninth Circuit concluded that this court did not abuse its discretion by imposing the requirement that Brown notify her current employer and any future employer of her conviction. The case was remanded for the court to answer whether Brown's sentence would have been any different if the court knew that the United States Sentencing Guidelines ("U.S.S.G.") were advisory.

The record from the original sentencing hearings clearly show that the sentence imposed in 2004 would not have been any different even if the United States Sentencing Guidelines (the "Guidelines") had been advisory at the time of sentencing. Moreover, the Court should continue to impose sentences within the Guideline range absent unusual circumstances that are not present here.

## Background

Shannon K. Brown is a convicted thief. When she was promoted to the position of bookkeeper for an insurance company, C.H.I. of Alaska, Incorporated, she kept cash payments from customers, creating fake accounting entries to conceal the money she was stealing. Presentence Report ("PSR") at 2. Faking over 250 separate accounting transactions and pocketing the money instead, she was able to steal over

$50,000. Attachment A to the PSR details the dates and amounts of cash collected and the false journal entry dates and journal entry numbers Brown entered into the accounting system. PSR at Attachment A.

C.H.I., the victim of this offense, is a company in Anchorage, Alaska, which acts as a broker between customers and insurance companies. C.H.I. sells insurance policies to customers and is paid a commission by the insurance company. The insurance policies are either paid for with agency billing or direct billing. PSR at 1.

Customers who use C.H.I. can make payments to either of the two insurance agents or to the office receptionist, and can pay with cash, money orders, personal checks, or cashier's checks. The C.H.I. employee who collects the payment makes an entry into C.H.I.'s computer noting the payment amount, method of payment, and name of the insured customer. The employee then gives the money to the bookkeeper. The bookkeeper is supposed to make a journal entry into the trust account, deposit the money into the trust account, and then make a journal entry when the money is sent to the insurance company. PSR at 1-2.

Brown was employed at C.H.I. from 1993 until May 1999. She was hired as a courier and was promoted to the position of bookkeeper in August 1998. Initially, Brown followed C.H.I. protocol as it related to accepting cash payments from co-workers. After a short period of time in the position of bookkeeper, however, Brown

began keeping the cash payments instead of depositing them into the trust account. Instead of creating a journal entry into the trust account reflecting the cash payment, she would create a journal entry in the asset account (commission receivables). By doing this, Brown was able to keep the cash and, from an accounting stand-point, C.H.I.'s books would appear to be balanced. At the time that these thefts were occurring, Brown was the only person who was responsible for depositing money into the bank account and was the only person who had access to the accounting system to record journal entries. PSR at 2.

After Brown left C.H.I., the owner noticed that his trust account was much lower than normal and his asset account was much larger than normal. The owner, his new bookkeeper, and a CPA began examining the records and discovered the defendant's theft. They determined that during several months that Brown was the bookkeeper, there were no cash deposits. This had never occurred prior to her becoming the bookkeeper or since she quit the position. Normally, C.H.I. averaged approximately $10,000 per month in cash deposits. Id.

The thefts, occurring soon after Brown was promoted to bookkeeper and continuing until her last day of work for the company, involved over 250 separate cash transactions. PSR at Attachment A. In her attempt to hide the thefts, Brown created false ledger entries to make it appear as if the money was in the proper

account. Attachment 1 at 8. (The district court adopted the findings of fact in the PSR when considering a sentence for Brown. Docket 35, Attachment (Page 1).)

Brown was interviewed by the FBI on August 27, 2003. After initially denying the theft, she admitted to taking money from C.H.I. She stated that she took the cash to pay bills and to buy "toys" that her husband, Steve Brown, wanted. Brown stated that Steve Brown was aware that she was taking the money and he encouraged her to do so, but that he did not threaten her or force her to take the money. PSR at 2.

The loss to C.H.I. was determined to be at least $56,615.32. However, the owner of C.H.I., in his victim statement to the court, stated, "There's an additional hundred and thirty-five thousand dollars gone over the same period of time that we can't prove, and the reason we can't prove it is because Shannon left, she got all the files in order and what she did is she destroyed all the records." Attachment 1 at 35. Brown did not cooperate by explaining how she perfected the scheme; the owner commented, "[f]rankly, if I could just figure out how it got done, it would be worth something to me." Id.

In her position at C.H.I., Brown was given a great deal of responsibility, freedom and trust by the owner. She knew that his business as a commercial insurance enterprise was governed by trust regulations. "I specifically had her read the trust regulations." Id. Brown knew "that having that money missing could shut

our business down. She was fully aware of that. I specifically went over it with her many times." Id.

The owner of C.H.I. pointed out to the district court at the sentencing hearing that this is a type of crime with many repeat offenders. "And I can tell you as an employer, . . . I want to know about it when somebody's – prior to employment with me, embezzled money." Attachment 1 at 36.

The probation officer recommended a sentence of 9 months' incarceration. Attachment 1 at 8. The government recommended that the court sentence Brown to six months, the low end of the applicable range, or alternatively, impose a split sentence to include three months in jail and three months on home detention or electronic monitoring. Attachment 1 at 10.

Brown agreed as to where she fell in the guideline range, specifically Offense level 10, Criminal History Category I, with a sentencing range of 6-12 months. Attachment 1 at 18. During her change of plea hearing Brown did not dispute that the amount of loss and restitution was over $50,000 and she ultimately agreed that the amount of restitution the court would impose would be $56,615.32. Docket 28 at 12. In her Sentencing Memorandum, Brown asked that the court downwardly depart by two levels to allow a term of straight probation. Docket 28 at 14. In the alternative, should the court decline to depart, Brown requested that the court sentence her to the

least restrictive term under the guideline range of 6-12 months; "[t]hat term would be a five year term of probation with the special condition that she serve 6 months in home detention." Id.; Attachment 1 at 32, 47-48.

Brown argued for several departures, but acknowledged to the court that it could accomplish her request for probation without the downward departures. Attachment 1 at 19. Under U.S.S.G. § 5C1.1(e)(3), one day of home detention could be substituted for one day of imprisonment; therefore, the court could impose five years of probation, with six months of home detention substituted for the six months minimum sentence of imprisonment. Attachment 1 at 19-20.

The maximum term of imprisonment for a violation of 18 U.S.C. § 1033 is ten years, making the offense a Class C felony under 18 U.S.C. § 3559(a)(3). The court found that based on a total offense level of 10 and a criminal history category of I, the guideline imprisonment range was 6 to 12 months. Attachment 1 at 7; U.S.S.G. Ch.5, Pt. A. Under U.S.S.G. § 5C1.1(c), if the minimum term of imprisonment in the applicable guideline range in the sentencing table is at least one but not more than six months, the minimum term may be satisfied by:

– a sentence of imprisonment; or

– a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to

the schedule in U.S.S.G. § 5C1.1(e), provided that at least one month is satisfied by imprisonment; or

– a sentence of <u>probation</u> that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in U.S.S.G. § 5C1.1(e).

The court considered and rejected all of the departures presented by defense counsel. The first departure requested by Brown was for extraordinary family responsibilities under <u>United States v. Leon</u>, 341 F.3d 928 (9th Cir. 2003). Brown's daughter had recently been diagnosed with an autonomous thyroid nodule, and an operation was being scheduled to determine whether it was cancerous. Attachment 1at 10. As unpleasant as the situation was, the court did not feel that Brown's family situation was extraordinary. Attachment 1 at 50. As the court was continuing the sentencing for thirty days for the probation office to investigate the feasibility of various intermittent confinement proposals, it offered to revisit the issue to get more information as to the daughter's true prognosis.    Attachment 1 at 50-51. No further discussion of this issue was held.

The second departure request the court considered was based on post-offense rehabilitation pursuant to <u>United States v. Thompson</u>, 315 F.3d 1071, 1077-78 (9th Cir. 2002). Brown argued that from the time the embezzlement was discovered until

the present, almost five years had elapsed – Brown had been crime-free, had obtained a new job where her handling of money was closely monitored, with no suggestion of any illegal activity during that time, and had positively rehabilitated herself. Attachment 1 at 10, 25-26. Although the efforts she had made were a permissible ground for departure, the district court found in its exercise of discretion, that "even if we freeze the amount at fifty-six thousand dollars specified in the presentence report and ignore the employer's concerns that the amount is truly significantly in excess of that" (Attachment 1 at 51), the amount of $56,000 overshadowed any rehabilitation that Brown may have accomplished subsequent to the offense. Id.

Pursuant to U.S.S.G. § 5K2.12 Brown also argued that she committed the offense because of serious coercion, or duress. Brown alleged that her criminality was directly traceable to her relationship with her former husband; "that he is the Svengali or the Phagun (sic) hiding in the background who truly benefitted from the thefts that Ms. Brown conducted." Attachment 1 at 11-12. The court agreed with the argument of the government that Brown was subject to a number of stresses and strains, but that she elected to respond to those strains by stealing. Attachment 1 at 51. Her former husband may have been a poor spouse and a predatory human being, but Brown was able to separate herself from him and for that she should be

commended.  However, the court found that this was not a coercion case or a self-defense case.  Id.

Brown also asked the court to depart under U.S.S.G. § 5K3.1, a new policy statement allowing, upon motion of the government, the court to depart downward not more than four levels pursuant to the early disposition program authorized by the Attorney General.  Attachment 1 at 12.  The court agreed with the government that such a departure would not have been approved for this type of a theft, and that the amount of money taken disqualified her from any fast track program.  Attachment 1 at 16-18, 52-53.

Finally, Brown argued that under Koon v. United States, 518 U.S. 81 (1996), all of these factors, even if individually not sufficient to trigger a departure on their own, should in combination motivate the district court to depart.  Attachment 1 at 13.  However, the district court declined the invitation: "Finally, a combination of factors is inappropriate in my view because none of the factors, either individually or collectively, would have persuaded this Court to exercise discretion in this kind of case."  Attachment 1 at 53.

In addition, the district court was asked to look at the factors set forth in 18 U.S.C. § 3553, starting with the nature of the offense.  Attachment 1 at 31.  Brown acknowledged that the court had concerns with the seriousness of the offense, but

asked the court to look at her history and her characteristics as well – Brown claimed that she had overcome many hardships in her life. She argued that she would be adequately deterred from committing crimes in the future because she would not want to let her family down. Brown had severed her relationship with her former husband who was "the catalyst from her life that caused this behavior," and therefore the public would be protected from any future crimes. Attachment 1 at 31. She claimed that she had rehabilitated herself, had no problems for the past five years, and had maintained employment. Attachment 1 at 31-32. The district court was asked to weigh the need to inflict punishment on Brown against society's interest in keeping her employed so that she could care for her daughter, maintain health insurance coverage for her daughter and continue to be a productive member of society as she had been for the past five years. Attachment 1 at 24, 32.

In imposing sentence and considering whether the case was an appropriate one for departures, the court stated that it had evaluated the totality of the circumstances, the facts of the case as disclosed by the presentence report and supplemented by the parties, and the guideline range permitted. Attachment 1 at 50.

The district court did not think it was an appropriate case for the departures that had been requested, but did find that the same result could be obtained with a sentence of probation with conditions. Id. The district court sentenced Brown to probation for

a term of five years, with a special condition that she "shall participate in the home confinement program for a period of six months within the first year of probation. . ., which will include electronic monitoring." Docket 35 at 3; Attachment 2 at 25. The district court explained the parameters of electronic monitoring and Brown acknowledged that she understood and accepted that responsibility. Attachment 1 at 8. Brown did not object to this aspect of her sentence; indeed, this was the sentence she requested. Docket 28 at 14; Attachment 1 at 32, 47-48.


## Argument

**A.    The Court would have imposed the same sentence if the U.S.S.G. had been advisory.**

In reaching its decision regarding Brown's sentence, the Court not only applied the Guidelines, but also effectively reviewed and applied the statutory sentencing factors outlined in 18 U.S.C. § 3553. Those factors, when considered again today, lead to the same conclusion - a sentence of five years of probation, with a Special Condition of Probation to include participation in the home confinement program for a period of six months within the first year of probation, to include electronic monitoring - is appropriate.

The factors the court considered at sentencing, and must consider under Section 3553(a) include:

**(1) the nature and circumstances of the offense and the history and characteristics of the defendant.**

The court thoroughly considered Brown's personal and family circumstances, her current employment history, and the nature and circumstances of the offense. The court did not follow the recommendations of jail time for Brown, but saw that a period of home detention would serve as an adequate means of punishment in addition to a five year period of probation.

**(2) The need for the sentence to imposed to reflect the seriousness of the offense, promote respect fo the law, and to provide just punishment.**

This was a serious offense. "The reality, of course, is that Ms. Brown stole over fifty thousand dollars in over two hundred and fifty separate cash transactions. She began stealing money soon after she was promoted to . . . bookkeeper and continued stealing until the last day of work for the company. In an attempt to hide the thefts, she created false ledger entries to make it appear as if the money were still present." ER Tab H at 13-14. The sentence imposed by the court was commensurate with, if not more lenient than, the sentences given others who have committed similar offenses and have the same criminal history.

**(3) The need for the sentence to afford adequate deterrence and to protect the public.**

The Special Condition of probation imposed by the court and upheld by the Ninth Circuit Court of Appeals - third party risk notification - satisfied this concern. The court weighed all of the arguments of the parties, but was convinced that the special condition of employer notification was necessary. The court recognized that in the five years that had passed since Brown's criminal activity, she had maintained employment with the State of Alaska and, to date, there was no indication that she was engaged in criminal activity in that job. Attachment 2 at 14. However, in spite of Brown's record, the court imposed the employer notification provision because he was "fearful that Ms. Brown would become a recidivist." Attachment 2 at 15. "To the extent that the Court must be concerned about community protection, employer notification is a necessary prerequisite, and the Court will therefore include within the conditions of probation the requirement for employer notification, typically requested in cases of this kind." Attachment 2 at 16-17.

Considering the seriousness of this offense – the theft of funds from an insurance brokerage company by Brown while she was its bookkeeper – and Brown's current employment with the State of Alaska in a position handling financial

transactions, this special condition imposed by the district court was more than reasonable.

Considering all these factors, as the court did, Brown's original sentence remains appropriate.

## B. The Court Should Continue to Follow the U.S. Sentencing Guidelines

In addition to the above, it is the position of the United States that absent highly unusual circumstances the Court should continue to apply and follow the United States Sentencing Guidelines.

In United States v. Booker, 125 S.Ct. 738 (2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." Booker, 125 S.Ct. 738, at 757. This ruling results in a system in which the sentencing court, while informed by the Guidelines, may impose any sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to review by the Court of Appeals for "reasonableness." Id. at 767.

In the wake of <u>Booker</u>, this Court must make a correct calculation under the existing Guidelines, and then consider the final guideline calculation when determining the sentence to be imposed. Justice Breyer's majority opinion directed that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." <u>Id.</u>

The position of the United States is that, absent highly unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by the Court. This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in <u>Booker</u> recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. <u>See, e.g.</u>, <u>id.</u> at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); <u>id.</u> at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); <u>id.</u> at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); <u>id.</u>

at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of 15 years of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct ...."

Thus, fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing, and should occur absent unusual circumstances. The government therefor supports the opinion in United States v. Wilson, 350 F.Supp.2d

910, (D. Utah, Jan. 13, 2005), which shared this conclusion. In his assessment in

Wilson, on the day after Booker was decided, Judge Cassell explained at length the

reasons supporting this view. As he stated, the Guidelines represent the product of an

expert commission, which has studied the sentencing process at great length, under the

specific mandate of Congress to fashion recommended sentences which carry out the

purposes defined by Congress. The resulting Guidelines, Wilson held, plainly reflect

the public's will, as expressed by their democratically elected representatives, in that

Congress has repeatedly approved of the Guidelines or acted to adjust them to

Congressional preference. Wilson further observed that guided sentencing appears to

have had a positive impact in deterring criminal conduct throughout the country, and

thus serves the purpose of deterrence as well as punishment and fairness. For all of

these reasons, Judge Cassell determined that "the court will give heavy weight to the

Guidelines in determining an appropriate sentence. In the exercise of its discretion, the

court will only depart from those Guidelines in unusual cases for clearly identified and

persuasive reasons." Id. at 192.

Accordingly, a sentence within the Guideline range is presumptively reasonable,

and accommodates the Congressional purpose, affirmed by the Supreme Court, of

obtaining fair sentences which are uniform to the extent possible. The government

anticipates that only sentences outside the guideline range will be subject to appellate scrutiny for reasonableness in light of the Congressional mandate.

In the case of Shannon K. Brown, no unusual circumstances exist which warrant an exception to the preference for Guideline sentencing. Therefore, the government respectfully recommends that the Court uphold the original Guideline sentence imposed in ths case.

## Conclusion

For all the reasons stated above, the United States supports the original sentence imposed in this case.   The factual record in this case is well established. No further hearing is necessary.

RESPECTFULLY SUBMITTED this 22nd day of December, 2005 in Anchorage, Alaska.

TIMOTHY M. BURGESS
United States Attorney

RETTA-RAE RANDALL
Assistant U.S. Attorney

I declare under penalty of perjury
that a true and correct copy of the
foregoing was sent to the following
counsel of record on December 22, 2005, via:

(✔) FPD box in the US Attorneys Office

MJ Haden
Staff Attorney
Federal Defender
550 W. Seventh Avenue, Suite 1600
Anchorage, Alaska 99501

Mary Frances Barnes, United States Probation Office

Executed at Anchorage, Alaska on
December 22, 2005

*Kristen M. Eckstadt*
Legal Secretary
Office of the U.S. Attorney